**E-Filed 5/4/2011**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| BRAGA RANCH, INC., <br>     Plaintiff, <br> v. <br> SALYER AMERICAN FRESH FOODS, et al., <br>     Defendants. | Case Number 5:09-cv-04207-JF/PVT |
| MAJOR FARMS, INC., <br>     Plaintiff, <br> v. <br> SALYER AMERICAN FRESH FOODS, et al., <br>     Defendants. | Case Number 5:09-cv-04985-JF/PVT |
| HIGASHI FARMS, INC., <br>     Plaintiff, <br> v. <br> BANK OF THE WEST, et al., <br>     Defendants. | Case Number 5:09-cv-04983-JF/PVT <br><br> ORDER[1] DETERMINING THE VALIDITY OF PACA CLAIMS |

---

[1] This disposition is not designated for publication in the official reports.

Case Nos. 5:09-cv-04207-JF/PVT, 5:09-cv-04985-JF/PVT, 5:09-cv-04983-JF/PVT
ORDER DETERMINING THE VALIDITY OF PACA CLAIMS
(JFLC3)

# I. BACKGROUND

## A. Procedural Background

In 2009, Salyer American Fresh Foods ("SAFF"), an agricultural commodities broker, entered into agreements with vegetable growers in Monterey County, California. It entered into Shared Equity Farming Agreements with several growers, including K&S Farms, LLC ("K&S"), Merrill Farms, LLC ("Merrill"), Braga Ranch, Inc. ("Braga"), and Major Farms ("Major"), pursuant to which it purchased a share of the crops produced by the growers and agreed to harvest, pack, and market the crops. It entered into a Farming, Marketing and Security Agreement with M. Nishimori Farms, Inc. ("Nishimori"), pursuant to which Nishimori was to produce and SAFF would harvest, pack, and market a crop to be owned fifty-percent by SAFF and fifty-percent by Nishimori. Finally, it entered into an oral agreement with Sabor Farms ("Sabor") for the purchase of crops to be delivered by Sabor to SAFF. Each of the growers alleges that it has not received payment for vegetables supplied under its particular contract.

As a result of a separate action brought by the Bank of the West ("the Bank"), the Monterey Superior Court imposed a receivership on SAFF and appointed Steve Franson as the receiver ("the Receiver"). Plaintiffs and Interveners assert claims against SAFF, the Bank, and the Receiver pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a, *et seq.*, seeking to enforce their PACA trust rights. On July 19, 2010, the Court ordered the Bank to establish a segregated PACA account and claims procedure ("the PACA Order"). Claimants were required to file a proof of claim by September 1, 2010. PACA Order ¶ 8. Objections to timely filed PACA claims were to be filed by October 1, 2010. *Id.* ¶ 12.

Sixteen PACA claims were filed on or before the September 1, 2010, deadline. The Bank and the Receiver initially objected to all sixteen claims, alleging deficiencies such as improper inclusion of prejudgment interest and improper requests for attorneys' fees. Ten of these disputes have been resolved, leaving the claims K&S, Nishimori, Merrill, Braga, Sabor, and Major (collectively "Claimants") for determination by the Court.

## B. The Perishable Agricultural Commodities Act

PACA was enacted by Congress in 1930 with "the intent of preventing unfair business

practices and promoting financial responsibility in the fresh fruit and produce industry." *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997). The statute provides in relevant part that a licensed dealer or commission merchant shall hold all perishable agricultural commodities and proceeds from their sale "in trust for the benefit of all unpaid suppliers or seller of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received" by such suppliers. 7 U.S.C. § 499e(c)(2).

Regulations promulgated pursuant to the statute establish a schedule according to which various payments must be made. 7 C.F.R. § 46.2(aa). Parties may agree to different timelines for payment as long as they reduce their agreement to writing before entering into the transaction. 7 C.F.R. § 46.2(aa)(11). However, "the maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under trust is 30 days after receipt and acceptance of the commodities." 7 C.F.R. § 46.46(e)(2). "When the parties expressly agree to a payment time period different from that established [by regulation], a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction." 7 U.S.C. § 499e(c)(3). The party claiming the existence of such an agreement for time of payment has the burden of proof. 7 C.F.R. § 46.2(aa)(11).

An unpaid supplier loses the benefit of a PACA trust unless written notice of intent to preserve benefits is given within thirty days after the payment is due or after the expiration of such other time as the parties have expressly agreed to in writing before entering into the transaction. 7 U.S.C. § 499e(c)(3). The written notice must "set forth information in sufficient detail to identify the transaction subject to the trust." 7 U.S.C. § 499e(c)(3). The regulations require that the notice include the transaction dates, commodities, invoice price, terms of payment (if appropriate), and the amount that is past due and remains unpaid. 7 C.F.R. § 46.46(f). If the claimant holds a PACA license, it may use its invoice or billing statements as the notice if the invoice or billing statements contain specific statutory language. 7 U.S.C. § 499e(c)(4).

## II.  DISCUSSION

**A.    Whether Claimants waived their right to PACA trust protection by agreeing to a payment term beyond thirty days.**

The Bank and the Receiver object to the claims of all remaining Claimants except Sabor[2] on the basis that Claimants do not qualify for PACA trust protection because they agreed to payments more than thirty days after SAFF's receipt and acceptance of the commodities.

K&S, Merrill, Major, and Braga[3] each entered into a Shared Equity Farming Agreement with SAFF.[4]  The payment schedule in each of the agreements is established by § 5.2, which provides that

> (a) Payments to GROWER shall be . . . made in accordance with the schedules(s) set forth in the applicable Exhibit(s) attached hereto.
> (b) Except as otherwise specifically provided in the Exhibit(s) attached hereto, SAFF's Final payment of GROWER's Net Sale Proceeds shall be made to GROWER, upon GROWER's request, any time after SAFF's final statement to GROWER.  SAFF's final statement shall be provided to GROWER within 45 days after SAFF receives that last proceeds from the Crop sales deemed collectible without beginning collection proceedings.  The final statement is subject to change to reflect sales allowances and uncollectible amounts.

K&S PACA Proof of Claim, Ex. A.  The exhibits attached to the agreements include schedules for monthly "Growing Advance" payments but not for payments of sales proceeds.  *Id.*  The

---

[2] Because Sabor entered into an oral agreement with SAFF, its PACA trust rights were protected once it delivered the produce.  The Bank nonetheless contends that the Grower Statement Recaps provided by SAFF and included with Sabor's invoices 1334-36 provide for a time of payment more than thirty days after receipt.  Sabor Proof of Claim, Ex. B.  However, as Sabor notes, these dates are located in a shaded box entitled "For Accounting Use Only," and there is no evidence in the record that Sabor expressly agreed to those dates. *Id.*

[3] Braga contends that two of the invoices included in its claim are for produce not covered under the Shared Equity Farming Agreement.  The Receiver claims to have insufficient information to determine whether the produce referenced in the invoices was subject to the agreement.  However, the party seeking to establish a payment schedule that varies from PACA regulations bears the burden of showing that such an alternative schedule was agreed upon by the parties.  Thus, even if it did somehow waive its PACA trust rights to produce covered by the agreement, there is an insufficient showing that Braga lost its right to trust protection for the produce covered by invoices 1139 and 1140.

[4] Nishimori entered into a Farming, Marketing and Security Agreement that contained a similar provision under which SAFF was obligated to make a final payment within thirty days after it received the final proceeds from sale of crop. Nishimori PACA Proof of Claim, Ex. A.

Bank and the Receiver contend that by agreeing to payment of net sales proceeds forty-five days after SAFF received payment from its crop sales, claimants exceeded "[t]he maximum time for payment for a shipment to which a seller, supplier or agent can agree and still qualify for coverage under the trust," 7 C.F.R. § 46.46 (e)(3), and that accordingly that none of the claimants is entitled to PACA trust protection.

Claimants point out that pursuant to the official commentary to the regulations, "if the sales contract is silent as to the time of payment, the times specified in § 46.2(aa) of the regulations apply to the transaction and that the transaction is subject to trust protection." 49 Fed. Reg. 45,736 (Nov. 20, 1984). They contend that while their agreements with SAFF contain terms relating to advances for growing costs and a final payment following final accounting, they are silent as to other payments, leaving the default prompt payment provisions in place. They argue that the "final" payment referenced in the agreements is not a payment for sales proceeds but rather is a "clean-up payment" for the purpose of settling accounts after a final statement is issued.

Claimants also point out that a PACA trust "automatically arises in favor of a perishable agricultural commodities seller upon delivery of perishable agricultural commodities." *Middle Mt. Land & Produce, Inc. v. Sound Commodities, Inc.*, 307 F.3d 1220, 1224. They argue that "should the Court somehow interpret the grower agreements as waiving the Claimants' PACA trust rights . . . , then the waivers are ineffective, as the requisite steps under both California law and the PACA were not undertaken to insure that the growers' waiver of important statutory rights was knowing, done with adequate awareness of the likely consequences, and with a full understanding of the waiver." R&J Claimants Reply 8:6-10. The Bank takes the position that because the contracts contained payment period in excess of thirty days, the sales of produce under the agreements never qualified for PACA trust protection in the first instance.

As discussed previously, PACA was intended to "suppress unfair and fraudulent business practices in the marketing of fresh and frozen fruits and vegetables," and in particular to protect sellers from the sharp practices of agricultural buyers. *Sound Commodities*, 307 F.3d at 1224. It would be inconsistent with that intent to conclude that producers may lose their rights under the

statute unknowingly by agreeing to an ambiguous timeframe for receiving payments. Fortunately, the regulations provide that if parties agree to a payment period different from that established by regulation, they must do so expressly. In addition, "a copy of any such agreement shall be . . . disclosed on invoices, accountings, and other documents relating to the transaction." 7 U.S.C. § 499e(c)(3). Finally, "the party claiming the existence of . . . an agreement for time of payment [other than that provided for in the regulations] shall have the burden of proving it." 7 C.F.R. § 46.2(aa)(11).

While the agreements at issue here provide for a "Final payment of GROWER's Net Sale Proceeds" beyond the statutory period, they are at least ambiguous as to whether the parties intended to contract around PACA's prompt payment provisions.[5] To assist the Court in resolving the ambiguity, Claimants present declarations, including declarations from former SAFF employees, *see* Welch Decl. ¶ 3, Lopez Decl. ¶¶ 8,9, indicating that the parties contemplated regular payments of sales proceeds as the crops were harvested and sold, and that the final payment was intended only to adjust for an overpayment or underpayment resulting from situation such as uncollected payments from third-parties, Welch Decl. ¶¶ 7, 11. The Receiver's own declaration and attached exhibits indicate that SAFF regularly made monthly payments of sales proceeds to its producers. *See* Franson Decl. Ex. A. The Receiver contends that the payment schedule shows that SAFF rarely made grower payments within thirty days of harvest. *Id.* ¶ 8. However, the issue is not whether *SAFF* made prompt payments but whether the *Claimants* agreed to contract around the PACA prompt payment provisions expressly and in writing. The Court finds and concludes that the Bank and the Receiver have not met their

---

[5] The contracts are governed by California law. K&S PACA Proof of Claim, Ex. A. When the meaning of the words used in a contract is disputed, a court must "provisionally receive any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible," determine if the language is reasonably susceptible to the interpretation urged, and if so admit the evidence to aid its interpretation. *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1126 (Cal. Ct. App. 2008). The Bank contends that it is prejudicial to admit extrinsic evidence because Scott Salyer, the head of SAFF, is under indictment and has asserted his rights under the Fifth Amendment. However, the Bank has made no showing that Salyer is in possession of relevant evidence with respect to the parties course of dealings that is not available from other sources.

burden of showing that the parties agreed to a time of payment other than those provided by the regulations.

**B.  Whether Claimants are entitled to attorneys' fees.**

The Bank and the Receiver object to each of the claims for attorneys' fees., contending that there is no contractual basis for such a claim.  Although PACA does not provide an independent basis for an award of attorneys' fees, contractual attorneys' fees incurred by a produce supplier in connection with enforcing PACA trust rights may be included within a PACA trust claim.  *Sound Commodities, Inc.*, 307 F.3d at 1220.

The Shared Equity Farming Agreements entered into by K&S, Merrill, Major, and Braga each include the following provision:

> If either Party defaults on or breaches its obligations or warranties under this agreement and, after ten (10) days written notice, fails to cure such breach, then the other Party shall be entitled to: (i) terminate this Agreement upon written notice to the other party; (ii) terminate any Agricultural Lease or Sublease that may be in effect between the parties; and (iii) damages that include but are not limited to, specific performance and *legal damages*, including a reasonable amount for lost profits.

K&S PACA Proof of Claim, Ex. A (emphasis added).  Claimants contend that "legal damages" reasonably may be interpreted to include attorneys' fees, and that any ambiguities should be construed against SAFF as the drafter of the agreements.  However, the meaning of "legal damages" is well understood, particularly when used in conjunction with "specific performance."  The term is not ambiguous and thus it cannot be construed to support a claim for attorneys' fees.

Claimants also argue that they are entitled to attorneys' fees because their efforts created a common fund benefit.  *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257-59 (1975); *In re Milton Poulos*, 947 F.2d 1531, 1353 (9th Cir. 1991).  However, according the the declaration of the Receiver, the segregated PACA fund was created prior to the filing of Claimants' suits. Franson Decl. ¶ 9.  Claimants' efforts clearly were focused on securing their own claims rather than achieving a benefit for a common fund.  *See In re Milton Poulos*, 947 F.2d at 1353 ("[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself is entitled to a reasonable attorney's fee from the fund as a whole.").

**C.      Whether Claimants may claim prejudgment interest.**

Claimants seek an award of prejudgment interest at the California statutory rate. While the Bank and the Receiver acknowledge that the Court has broad discretion to award prejudgment interest under PACA, they contend that if any prejudgment interest is awarded it should be at the considerably lower federal prejudgment interest rate. The Ninth Circuit has observed that the federal post-judgment interest rate is appropriate for fixing the rate for pre-judgment interest, "unless the equities of a particular case demand a different rate. *Columbia Brick Works, Inc. v. Royal Insurance Co.*, 768 F.2d 1066, 1070-71 (9th Cir. 1985). However, Claimants direct the Court's attention to several PACA cases in which courts applied a state statutory rate. *See, e.g.*, Endico Potatoes v. CIT Group/Factoring, 67 F.3d 1063, 1071 (2d Cir. 1995); *May Produce Co., Inc. v. East West Imports, Inc.*, No. 3:09-cv-1383-L, 2009 U.S. Dist. LEXIS 117076, at \*4 (N.D. Tex. 2009); *Delta Pre-Pack Co. v. Gitmed*, 2009 U.S. Dist. LEXIS 89727, at \*3 (E.D. Cal. 2009). PACA was enacted in part because of the degree to which producers' livelihood may depend on the sale of their produce to a particular buyer. In light of the stakes for individual producers, it is important as a matter of policy to provide incentive for prompt payment to suppliers. *See May Produce*, 2009 U.S. Dist. LEXIS 117076, at \*4. In light of the equities involved, the Court concludes that an award of prejudgment interest at the California statutory rate is appropriate to compensate Claimants fairly for their loss.

**D.      Objections to Individual Claims**

      **1.      M. Nishimori Farms, Inc.**

The Receiver objects to Nishimori's claim because it includes a $50,737.50 shortfall in SAFF's portion of the growing costs. The Farming, Marketing, and Security Agreement between Nishimori and SAFF provided that the celery crop was to be produced on 150 acres located in Ventura County and would be owned fifty percent by each party, with growing costs and net profits realized from the sale of crops to be divided in accordance with the parties' percentage of the equity. Nishimori Proof of Claim, Ex. A. SAFF agreed to pay its share of the growing costs in ten equal installments. However, SAFF only made nine such payments, failing to remit the final $50,737.50. *Id.* Nishimori contends that because SAFF did not make the final

8
Case Nos. 5:09-cv-04207-JF/PVT, 5:09-cv-04985-JF/PVT, 5:09-cv-04983-JF/PVT
ORDER DETERMINING THE VALIDITY OF PACA CLAIMS
(JFLC3)

payment, Nishimori is entitled to a fifty-five percent equity interest in the crop proceeds covered under the PACA trust.

PACA claimants may not recover for items that are neither perishable agricultural commodities nor sums owing in connection therewith. 7 U.S.C. 499e(c)(2). Contrary to Nishimori's assertion, the agreement does not create a floating equity interest in the crops; rather, it provides only for a fifty-percent interest for each party. Nishimori Proof of Claim, Ex. A. While SAFF agreed to make the specified growing payments and may have defaulted on that obligation, failure to make a growing payment is not the same as the failure to pay for a perishable commodity. The Receiver's objection to this amount is well-taken.

### 2.  Braga Ranch, Inc.

The Receiver contends that his final accounting shows a principal amount owing that is $15,862.97 less than the amount claimed by Braga. Braga responds that its claim is based on an invoice that reflects the last amount provided by the Receiver to Braga prior to Braga's sending the invoice. The Court lacks sufficient information to resolve this objection at the present time and will request additional briefing from the parties.[6]

### 3.  Major Farms

The Receiver objects to the claim of Major Farms on the basis that Major failed to give proper notice of its intent to preserve its PACA rights. PACA requires that written notice of intent to preserve the benefits of the trust be given within thirty days, setting forth "information in sufficient detail to identify the transaction subject to the trust." 7 U.S.C. § 499e(c)(3). [?] regulations, the notice must state expressly that it is a notice to preserve benefits and must include transaction dates, a description of the commodities, the invoice price, and the amount claimed to be past due and unpaid. 7 C.F.R. § 46.46(f)(1). The regulations also provide that PACA licensees may preserve their right to PACA trust protection by including specific language in their invoices and billing statements as an alternative to the requirements of 7 C.F.R.

---

[6] If the parties are unable to resolve this small difference amicably, then on or before May 11, 2011, each party shall submit a letter brief not to exceed five pages in length explaining its accounting and providing any available documentary support.

§ 46.46(1)-(2).  7 C.F.R. § 46.46(f)(3).  Major is not a USDA licensee.

Major claims that it provided adequate notice of its intent in a document dated July 24, 2009.  Although the top of the document included the words "Invoice 2009," a boldface section at the bottom of the first page reads "Notice of Intent to Preserve Trust Benefits," and is followed by the statutory language of § 46.46(f)(3).  Major Proof of Claim, Ex. C.  Major asserts that this document meets of the requirements of § 46.46(f)(1).

The Receiver argues that because Major is not a licensee, it cannot take advantage of the provision in § 46.46(f)(3) allowing licensees to provide notice of intent to preserve benefits in an invoice.  He claims that accepting Major's argument would render either § 46.46(f)(1) or § 46.46(f)(3) superfluous.  However, compliance with § 46.46(f)(3) exempts a licensee from *all* of the additional requirements of § 46.46(f)(1)-(2), while § 46.46(f)(1) requires only that the notice of intent to preserve benefits "must include the statement that it is a notice of intent."  Section 46.46(f)(1) does not state that a notice of intent cannot perform any other purpose.

Major argues that it has substantially complied with PACA and its implementing regulations.  The Bank contends that Ninth Circuit case law requires actual rather than substantial compliance with both the statute and the regulations before a claimant is eligible for PACA trust protection.  In *In re San Joaquin Food Service, Inc.*, 958 F.2d 938, 940 (9th Cir. 1992), the court concluded that a claimant's eligibility for PACA protection depends on actual compliance with the requirements that Congress included in the statute itself.  However, the court distinguished cases in which the claimant met the statutory mandates but complied only substantially with the regulations.  Here, unlike the claimant in *San Joaquin*,, Major appears to have set forth "information in sufficient detail to identify the transaction subject to the trust."  7 U.S.C. § 499e(c)(3).

At oral argument, the Bank raised additional concerns about the timing of Major's notice of intent.  However, as Major observes, SAFF was responsible for harvesting, marketing, and selling crops grown by Major.  SAFF thus was in sole possession of the information necessary for Major to file a notice of intent to preserve benefits.  Major claims that it did not have the information it needed for a complete notice of intent until it received the grower statement recap

from SAFF and the Receiver and that it filed its notice promply after receiving that information. Sig Decl., ¶ 20. Neither the Bank nor the Receiver contradicts this claim. In similar instances, courts have recognized that where a debtor is responsible for harvesting the crop and has sole possession of the information necessary to permit a claimant to give notice of intent to preserve benefits, delay in obtaining that information should not prejudice the claimant. *See In re Carlton Fruit Co.*, 84 B.R. 810 (M.D. Fla. 1988) ("[I]t is incomprehensible that Congress intended with legislation clearly designed to protect a seller of perishable agricultural commodities that a dealer in the commodities such as the Debtor could avoid the imposition of a PACA trust simply by refusing to give to the seller the information needed for the notice of intent.").[7]

### III. CONCLUSION

Good cause therefor appearing, Claimants' motions are granted in part and denied in part as set forth above. The parties shall meet and confer to provide an accurate calculation of the total amount of pre-judgment interest to be calculated at the California statutory rate for prejudgment interest.

IT IS SO ORDERED.

DATED: May 4, 2011

_____
JEREMY FOGEL
United States District Judge

---

[7] The Receiver also objects to Major's claim for $8,687.55 for a category of charges it describes as "Outsides." Major billed these amounts in earlier invoices and referenced them in its invoices dated June 3, 2009, and June 24, 2009. The Receiver contends that the because the invoices were insufficient to preserve benefits, and the earlier invoices were not included in the proof of claim, Major has failed to provide sufficient supporting documentation for these charges. However, the record indicates that Major supplied the Receiver with information with respect to the "Outsides" on June 3, 2009 and June 5, 2009. Sig Decl. ¶¶ 21-22 & Ex. E, F. In light of this information, the subsequent references to these charges in the documents included in Major's PACA claim were adequate evidence to enable the Receiver make a "just determination of [Major's] claim," Claim Procedure Order at 21.